**ARCADIA DEVELOPMENT CORP., et al., Petitioners, Appellants,**

v.

**CITY OF BLOOMINGTON, Respondent.**

No. C0–96–157.

Court of Appeals of Minnesota.

Aug. 13, 1996.

Review Denied Oct. 29, 1996.

---

Christopher J. Dietzen, Daniel W. Voss, Sharna A. Wahlgren, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for appellants.

John E. Simonett, Clifford M. Greene, John M. Baker, Green Espel, P.L.L.P., Minneapolis, David R. Ornstein, City Attorney, Greg Brooker, Associate City Attorney, Bloomington, for respondent City of Bloomington.

Maury Landsman, Minneapolis, for Amicus Curiae APAC.

Hubert H. Humphrey, III, Attorney General, John S. Garry, Assistant Attorney General, St. Paul, for Amicus Curiae, State of Minnesota.

Considered and decided by HUSPENI, P.J., TOUSSAINT, C.J., and HOLTAN, J.*

## OPINION

TOUSSAINT, Chief Judge.

Appellants Arcadia Development Corp., a Minnesota corporation, and Mildred Collins (Arcadia) brought this action against respondent City of Bloomington, a municipal corporation (City). Arcadia challenges the constitutionality of a City ordinance requiring mobile home park owners who close their parks to pay relocation costs to park residents. Arcadia's complaint alleges that (1) application of the ordinance constitutes a regulatory taking without just compensation and is a taking for governmental enterprise, (2) the ordinance, as applied, is unconstitutional because it denied Arcadia its right to substantive due process and equal protection, and (3) the City's actions in adopting the ordinance constitute intentional infliction of emotional distress on Mildred Collins.

Arcadia appeals from the district court's grant of summary judgment to the City on all of its claims. Amicus curiae briefs have been submitted by the State of Minnesota and by All Parks Alliance for Change (APAC). Both amici support affirmance of the district court's grant of summary judgment to the City. We affirm.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

In 1949, Mildred Collins and her husband William T. Collins[1] purchased a portion of the property involved in this action. They built their home on the property and also used it as a trailer park, which they operated under the name of "Collins Mobile Home Park."

The property consists of 13.57 acres located along Interstate 494, at the intersection of 78th Street and Chicago Avenue. Prior to 1958, the property was zoned C–A (commercial). In June 1958, the property was granted a permit to allow its continued use as a "transient trailer camp." Later that year, the property was rezoned to B–2 (retail business district). In March 1963, the City council rezoned the property from B–2 to FD–2 (freeway development II). The Collinses did not oppose this rezoning, and Collins Park became a non-conforming use.

While Collins Park operated debt-free for many years, it began to lose money in the late 1980's. Arcadia claims that the 1963 rezoning caused higher real estate taxes to be imposed on its property. Arcadia further claims that the rezoning and increased taxes were part of a clear policy by the City to eliminate Collins Park so that the property could be put to a higher real estate tax generating use. Arcadia decided to sell the property and began marketing it for $6.1 million in June 1988.

In late 1989, the City council considered the adoption of an ordinance to require mobile home park owners to pay certain relocation costs to park residents when a park closes. In 1987, the Minnesota legislature enacted a statute allowing municipalities to adopt this type of an ordinance. Minn.Stat. § 327C.095, subds. 1–5 (1988) (1987 Minn. Laws ch. 179, § 10). This enabling statute was inspired by the problems and financial hardships caused by the 1986 closing of another mobile home park in the City, Lyndale Lodge.[2]

The City discussed the proposed ordinance at four separate council meetings in September and October 1989. Arcadia and its counsel strongly opposed the ordinance at each meeting. The ordinance nevertheless was passed and became effective on December 15, 1989.

The ordinance's official purpose is stated as follows:

> In view of the peculiar nature and problems presented by the closure or conversion of manufactured home parks, the City Council finds that the public health, safety and general welfare will be promoted by requiring compensation to displaced residents of such parks. The purpose of this Article is to require park owners to pay displaced residents reasonable relocation costs and purchasers of manufactured home parks to pay additional compensation, pursuant to the authority granted under Minnesota Statutes, Section 327C.095.

Bloomington, Minn. City Ord. 89–57 (codified at Bloomington, Minn. City Code Art. VI, 15.69). The ordinance generally requires a park owner to pay a displaced resident the reasonable cost of relocating a mobile home to another park located within a 25–mile radius of the park being closed. If a resident cannot relocate, the resident may tender title to the purchaser of the park and

---

1. William Collins died in 1984. Since then, the property has been owned by Mildred Collins, William T. Collins QTIP Trust, and Arcadia Development.

2. The legislative history of the 1987 enabling statute discusses the unique relationship between mobile home residents and park owners. Many mobile home owners are persons of low to moderate income who have made substantial investments, not only in the purchase of their homes, but also in landscaping and other improvements. These investments in turn benefit the park owner, by making the park an attractive place by adding to its overall value.

Mobile homes are rarely moved once placed in a park, given the high cost and difficulty of relocation. When a mobile home owner wishes to move, the mobile home is usually sold in place and the purchaser continues to rent the pad on which the home is located. When a park closes, however, the sale value and the ability to sell a mobile home decrease dramatically. Thus, residents stand to lose all or most of the value in their homes when a park owner chooses to sell park property for a different and likely more profitable use.

receive compensation equal to the amount of the tax assessed value of the home. To protect a park owner's investment, the ordinance has a "cap," which limits the "total compensation to be paid to displaced residents by the park owner and purchaser" to 20 percent of the purchase price of the park.

In May 1992, Arcadia entered into a purchase agreement with Wal–Mart, Inc. The agreement was subject to several contingencies, including reduction in the purchase price by the amount it would cost to comply with the ordinance and approval of certain zoning changes that had been requested by City staff. Those zoning changes were subsequently approved by the City council based on Wal–Mart and Arcadia's agreement to abide by a number of conditions, including compliance with the relocation ordinance.

Collins Park was closed on February 22, 1994. Because there were ample vacancies within a 25–mile radius of the park, mobile homes that physically could be moved were moved. Only five of the 90 homes remaining in the park at the time of closing had to be acquired. Arcadia sold the property to Wal–Mart for $2,338,842.66, after deducting relocation expenses of $363,128.71.

Arcadia brought this action in September 1994. It claims that as a result of the City's adoption of the ordinance, it lost potential buyers and was forced to sell the property for substantially less than its market value.

## ISSUES

I. Did the district court err in granting summary judgment to the City on Arcadia's takings claim?

II. Did the district court err in granting summary judgment to the City on Arcadia's substantive due process and equal protection claims?

III. Did the district court err in granting summary judgment to the City on Mildred Collins's claim of intentional infliction of emotional distress?

## ANALYSIS

Summary judgment is proper when there are no genuine issues of material fact and either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. Where the material facts are not in dispute, a reviewing court need not defer to the district court's application of the law. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310 (Minn.1989).

Statutes and local ordinances are presumed valid and will not be declared unconstitutional unless clearly shown to be so. *City of St. Paul v. Kekedakis,* 293 Minn. 334, 336, 199 N.W.2d 151, 153 (1972); *State v. Ellis,* 476 N.W.2d 662, 664 (Minn.App.1991), *review denied* (Minn. Dec. 13, 1991). The party challenging a statute or ordinance's constitutionality has the burden of proof. *Ellis,* 476 N.W.2d at 664.

### I.

Takings analyses often involve factual inquiries that make summary judgment inappropriate. Nevertheless, a court may evaluate the legal significance of undisputed material facts without forcing parties to trial. *See 767 Third Ave. Assocs. v. United States,* 48 F.3d 1575, 1580 (Fed.Cir. 1995) ("Even though a regulatory taking analysis is normally ad hoc and fact-intensive, the [defendant] may still be entitled to judgment as a matter of law."). Because Arcadia's takings claim rests not on genuine issues of material fact, but on Arcadia's disagreement with the applicable legal standards and analyses to apply, it is amenable to summary judgment. *See Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604, 618 (9th Cir.1993); *Chesapeake Outdoor Enters., Inc. v. Mayor & City Council of Baltimore,* 89 Md.App. 54, 597 A.2d 503, 512–13 (1991).

### 1. Takings Analysis Under the United States Constitution

The Takings Clause states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. Its purpose is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d

1554 (1960), *quoted in Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986).

■ The parties generally agree that the challenged governmental action passage and enforcement of the ordinance did not constitute a per se taking. Arcadia does not claim there has been an actual taking of title or permanent physical invasion of the property; nor does Arcadia claim that it was denied all economically beneficial or productive use of the property. *See Yee v. City of Escondido*, 503 U.S. 519, 527–28, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992) (stringent mobile home rent control ordinance not physical taking of park owner's property); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). While Arcadia claims the value of the property diminished as a result of the ordinance, that alone is insufficient to demonstrate an actual or per se taking has occurred. *See Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993) ("mere diminution" in value of property, however serious, is insufficient to demonstrate a taking); *614 Co. v. Minneapolis Community Dev. Ag.*, 547 N.W.2d 400, 406 (Minn.App.1996) (property may be "taken" when owner alleges temporary deprivation of all economically beneficial or productive use of land).

■ The parties disagree on the correct standard to be applied. The City and State, as amicus, characterize the ordinance as a form of land-use regulation. *See Yee*, 503 U.S. at 527–30, 112 S.Ct. at 1528–29 (local legislation regulating the economic relationship between mobile home park owners and residents is a form of land-use regulation). They insist that the applicable takings standard is whether the ordinance substantially advances a legitimate governmental purpose. *See Dolan v. City of Tigard*, 512 U.S. 374, ——, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994) (legislative land-use regulation which neither fits within per se category nor transfers property to government "does not effect a taking if it 'substantially advance[s] legitimate state interests'") (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)).

Arcadia insists that a more onerous standard applies. That standard, also announced in *Dolan*, places the burden on the government to make an individualized determination establishing that compliance with governmental conditions bear a "rough proportionality," in both nature and extent, to the impact of those conditions. *Dolan*, —— U.S. at —— — ——, 114 S.Ct. at 2319–20. This analysis, however, applies only to adjudicative determinations that condition approval of a proposed land use on a property transfer to the government, which, standing alone, would clearly constitute a taking. *Id.* at ——, 114 S.Ct. at 2316. Accordingly, cases interpreting *Dolan* have confined its "rough proportionality" analysis to adjudicative land-dedication situations or to classic "subdivision exaction" cases. *See, e.g., Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1578–79 & 1579 n. 21 (10th Cir.1995); *Kottschade v. City of Rochester*, 537 N.W.2d 301, 307–08 (Minn.App.1995) (*Dolan*'s "rough proportionality" test met in case where the city required a developer to "dedicate land for street and highway improvements as a condition for subdivision approval"), *review denied* (Minn. Nov. 15, 1995). Because this case involves a challenge to a citywide, legislative land-use regulation, *Dolan*'s "rough proportionality" test does not apply.

■ The issue thus becomes whether the ordinance substantially advances a legitimate governmental purpose. Governments have broad powers and legitimate interests in regulating housing conditions in general and the landlord-tenant relationship in particular. *Yee*, 503 U.S. at 528–29, 112 S.Ct. at 1529. More specifically, Minnesota has long regulated the mobile home park industry to protect park residents. *See* Minn.Stat. §§ 327.31—.36 (manufactured home building code); 327B.01—.12 (manufactured home sales); 327C.01—.15 (manufactured home park lot rentals). Thus, the purposes of the ordinance and the 1987 enabling legislation are without question real and legitimate: protecting mobile home park residents from severe or complete losses of substantial investments in their homes when the park

owner decides to close their park by selling the land or changing its use. *See Adamson Cos., v. City of Malibu,* 854 F.Supp. at 1488–90, 1493 (both rent control and closure restrictions that protect investments made by mobile home park tenants in their homes serve legitimate governmental purposes); *Guimont v. Clarke,* 121 Wash.2d 586, 854 P.2d 1, 14 (1993) (aiding mobile home owners with relocation expenses caused by park closing is legitimate public purpose), *cert. denied,* 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563 (1994).

■ Once legitimate governmental interests are identified, courts simply require a nexus between the local legislation and the legitimate governmental purposes to be achieved by that legislation. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834–37, 107 S.Ct. 3141, 3147–49, 97 L.Ed.2d 677 (1987); *Adamson,* 854 F.Supp. at 1501–02. Legitimate governmental interests are substantially served by legislation seeking to redistribute benefits and burdens of economic life or otherwise to restore an equitable balance to an economic relationship, particularly at the end of that relationship. *See e.g., Concrete Pipe,* 508 U.S. at 640–47, 113 S.Ct. at 2289–92 (corporations withdrawing from multi-employer pension plans required to pay withdrawal liabilities to plan in order to protect remaining plan participants); *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 734 (8th Cir.1986) (past and present owners of contaminated property required to bear cost of cleaning up contamination under "Superfund" statute), *cert. denied* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Carpenters Dist. Council v. Dillard Dep't Stores, Inc.,* 778 F.Supp. 318, 325 (E.D.La.1991) (corporations closing plants without notice required to pay wages to workers after date of shutdown).

In this case, the immobile nature of mobile homes subjects tenants to extreme financial loss upon · park closure; at the same time, this immobility makes the rental of pads profitable for the park owner. *See Adamson,* 854 F.Supp. at 1488 (park owners in "superior bargaining position" to that of tenants even if no shortage of mobile home spaces exists); see also *Yee,* 503 U.S. at 523,

112 S.Ct. at 1526 ("Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself."). By requiring a park owner to pay mitigation fees or relocation costs to displaced residents when that owner decides to close its park or change its use, the ordinance has a direct nexus or connection to the interest of lessening the economic devastation imposed on displaced residents.

Arcadia asserts that an unconstitutional taking has occurred because the ordinance unfairly "singles out" or places the burden of solving the City's housing problems on the shoulders of a few property owners. Arcadia, however, chose to sell and change the use of its property and may be called upon to bear the costs of remedying problems caused by its decision. Moreover, Arcadia was not precluded from passing on anticipated costs of compliance with the relocation ordinance to their tenants in the form of rent increases. Finally, as the district court recognized, Arcadia secured some financial benefit following enactment of the ordinance in the form of lower property taxes and property tax refunds.

## 2. Takings Analysis Under the Minnesota Constitution

■ The Takings Clause of the Minnesota Constitution states: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. Minnesota courts generally apply the federal takings standards and examine whether a land-use regulation "deprives the property of all reasonable use." *Thompson v. City of Red Wing,* 455 N.W.2d 512, 516 (Minn.App.1990), ·*review denied* (Minn. June 26, 1990); *see also Parranto Bros. v. City of New Brighton,* 425 N.W.2d 585, 590 (Minn. App.1988), *review denied* (Minn. July 28, 1988). When land-use regulations are designed to benefit a specific "governmental enterprise," a compensable taking occurs if the property "has suffered a substantial and measurable decline in market value as a result of the regulations." *McShane v. City of Faribault,* 292 N.W.2d 253, 258–59 (Minn.

1980) (footnote omitted). The *McShane* enterprise function analysis applies only when a "specific governmental enterprise takes an effective easement." *Thompson*, 455 N.W.2d at 517.

■ Arcadia's governmental enterprise argument is based on its claim that the City's 1963 rezoning decision and the resulting increase in property taxes were part of a clear policy by the City to eliminate Collins Park so that the property could be put to a higher real estate tax generating use. The issue, is not whether the City's actions since 1963 evidence a governmental enterprise, but whether the ordinance was designed specifically to benefit a governmental enterprise or take an effective easement, such as the municipal airport in *McShane*, 292 N.W.2d at 258. We cannot conclude that an easement has been taken or that the ordinance was designed to benefit a specific governmental enterprise.

## II.

■ When legislation is not based on a suspect class and does not infringe on a fundamental right, it need only be rationally related to a legitimate governmental purpose in order to withstand federal equal protection or substantive due process challenges. *See Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (legislation adjusting burdens and benefits of economic life presumed constitutional and burden on challenger to establish legislature acted arbitrarily or irrationally). Legislation will fail rational basis review only when it rests on grounds irrelevant to the achievement of a plausible governmental objective. *Heller v. Doe*, 509 U.S. 312, 323, 113 S.Ct. 2637, 2645, 125 L.Ed.2d 257 (1993).

■ Essentially the same analysis and standards apply under the Minnesota Constitution. Legislation is constitutional so long as it serves to promote a public purpose; is not an unreasonable, arbitrary, or capricious interference with a private interest; and the means chosen bear a rational relation to the public purpose sought to be served. *Grussing v. Kvam Implement Co.*, 478 N.W.2d 200, 202 (Minn.App.1991).

■ Because the ordinance substantially advances a legitimate governmental purpose under the takings analyses, it satisfies this deferential rational basis test for equal protection and substantive due process purposes. *See Concrete Pipe*, 508 U.S. at 640, 113 S.Ct. at 2289 (given that employer's due process arguments are unavailing, "it would be surprising indeed to discover" that legislation nonetheless violates takings clause); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n. 12, 101 S.Ct. 715, 727 n. 12, 66 L.Ed.2d 659 (1981) (if legislation does not violate equal protection, it does not violate substantive due process either); *Skeen v. State*, 505 N.W.2d 299, 312 (Minn.1993) (standard applied to claims brought under state equal protection clause same as that applied to claims brought under federal equal protection clause); *State v. Morrow*, 492 N.W.2d 539, 547 (Minn.App.1992) (constitutional challenge under either due process or equal protection of federal or state constitutions raise similar questions).

Arcadia questions the "real" or "actual" motives for the ordinance and insists that the ordinance is "irrational," presumably because the City could have done more to protect park owners' private financial interests. Arcadia asserts that a remand is necessary for a trial on precisely what the City meant in the preamble of the ordinance by the reference to "the peculiar nature and problems presented by closure or conversion of manufactured home parks."[3] In doing so, Arcadia attempts improperly to shift the burden to prove the constitutionality of the ordinance onto the City.

■ Arcadia further criticizes the City for failing to make written findings in support of its decision to adopt the ordinance. *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416 (Minn.1981) (municipalities should prepare contemporaneous find-

---

**3.** As previously noted, the legislative history of the 1987 enabling statute, fully explains the peculiar nature and problems associated with closure of a mobile home park.

ings to support any zoning decision, whether legislative or quasi-judicial). This is not a challenge to a zoning decision, but to the City's adoption and enforcement of an ordinance. Legislative bodies generally are not required to articulate reasons for enacting a statute or ordinance. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Even when those reasons are articulated, a reviewing court must assume those reasons are the actual purposes of the legislation. *See Clover Leaf Creamery,* 449 U.S. at 464, 101 S.Ct. at 724. The rational basis test merely requires the challenged legislation to be supported by any set of facts either known or which could reasonably be assumed. *United States v. Carolene Prods. Co.,* 304 U.S. 144, 153–54, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938); *United States v. Osburn,* 955 F.2d 1500, 1505 (11th Cir.1992) ("any rationale Congress 'could' have had for enacting the statute can validate the legislation, regardless of whether Congress actually considered that rationale at the time the bill was passed"), *cert. denied,* 506 U.S. 878, 113 S.Ct. 223, 121 L.Ed.2d 160 (1992).

Arcadia finally asserts that the district court erred in rejecting the substantive due process analysis adopted by the Washington Supreme Court in *Guimont,* 854 P.2d at 14. In *Guimont,* the court acknowledged that the state has a

> legitimate interest in addressing the statewide problem of relocation expenses associated with mobile home park closings. Making funds available to mobile home owners who are forced to relocate substantially advances that interest.

*Id.* The court nevertheless added a third prong to the substantive due process analysis and concluded that the ordinance was unconstitutional because it was "unduly oppressive" on the landowner. *Id.* at 16.

The United States and Minnesota Supreme Courts do not currently require an examination of whether economic legislation is "unduly oppressive." *See Concrete Pipe,* 508 U.S. at 640, 113 S.Ct. at 2289 (imposition of withdrawal liability rationally related to terms of employer's participation in plan it joined and "that suffices for substantive due process scrutiny of this economic legislation"); *Snyder v. City of Minneapolis,* 441 N.W.2d 781, 789 (Minn.1989) (statute "survives equal protection and due process challenges" if rationally related to legitimate government objective). We refuse to add this third prong to our analysis.

## III.

Mildred Collins argues that she has pled sufficiently egregious facts to sustain her claim of intentional infliction of emotional distress. She claimed that the ordinance was enacted in direct response to her efforts to sell Collins Park. She insists that the City was protecting its own self-interests by requiring her to shoulder the full responsibility for displaced residents' relocation costs. She further insists that the ordinance was fully supported by the mayor of the City at the time, who was in a close mayoral race and who realized that if Collins Park closed there would be many dissatisfied potential voters. Mildred Collins insists that the City and the mayor acted in a self-interested manner, solely at her expense.

Intentional infliction of emotional distress is limited to cases involving "particularly egregious facts." Those facts must evidence conduct "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard v. United Press Int'l,* 330 N.W.2d 428, 439 (Minn.1983) (citation omitted). Even assuming the facts alleged by Mildred Collins are true, we cannot conclude that the conduct of the City rises to this extreme level. *Cf. Venes v. Professional Serv. Bureau, Inc.,* 353 N.W.2d 671 (Minn.App.1984) (jury could find outrageous or egregious conduct occurred when collection agency called consumer/debtor, who was suffering from cancer, a "deadbeat" and warned him to "stay out of Minnesota if you know what's good for you and your family").

## DECISION

The district court's grant of summary judgment to the City on all of Arcadia and Mildred Collins's claims is affirmed.

**Affirmed.**